UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**JASON LANGE,**

      **Plaintiff,**

  **v.**                                  **CASE NO. 8:19-cv-00034-CEH-CPT**

**TAMPA FOOD AND HOSPITALITY, INC.,
PLANT CITY HOSPITALITY, INC., DUKE'S
BREWHOUSE, INC., TAMPA FOOD &
ENTERTAINMENT, INC., and
LOUIS MENDEL,**

      **Defendants.**
_____/

**<u>DEFENDANTS'  TAMPA FOOD AND HOSPITALITY, INC., PLANT CITY
HOSPITALITY, INC., DUKE'S BREWHOUSE, INC., AND LOUIS MENDEL,
MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Tampa Food and Hospitality, Inc., Plant City Hospitality, Inc, Duke's
Brewhouse, Inc., and Louis Mendel, individually (collectively referred to herein as
"Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule
3.01(a), move for summary judgment on the grounds that there exists no genuine issue as to
any material fact, and Defendants are entitled to summary judgment as a matter of law.  The
basis for this motion is set forth in the following memorandum of law.

**<u>MEMORANDUM OF LAW</u>**

**I.**      **INTRODUCTION**

Can an individual who owned and operated two companies, who staffed those two
companies with three employees, and who paid those employees to provide services that he
agreed to perform for Defendants be classified as an employee rather than an independent

contractor?  This is exactly the challenge that Plaintiff, Jason Lange ("Lange") must overcome to prevail in this case.  Because hiring his own employees to perform services for Defendants are "compelling evidence" that he worked as an independent contractor, Lange cannot present sufficient evidence to support his claim for overtime under the FLSA and summary judgment should be granted in favor of Defendants.

## II.     STATEMENT OF FACTS[1]

### A. Defendants

Tampa Food and Hospitality, Inc. is a private, for-profit corporation that was established on January 1, 2016. (Mendel Ex. 3).  The business operates Scores ("Scores"), a gentlemen's club located at 2310 North Dale Mabry, Hwy, Tampa, FL 33607. (Id.).

Plant City Hospitality, Inc. is a private, for-profit corporation that was established on January 1, 2016.  The business operates Showgirls Men's Club ("Showgirls"), a gentlemen's club located at 4210 U.S. Highway 92 East, Plant City, FL 33566. (Mendel, Ex. 2).

Duke's Brewhouse, Inc. is a private, for-profit corporation that was established on March 24, 2015. (Mendel Ex. 4).  The business operates Duke's Brewhouse ("Dukes"), a sports bar and local eatery. (Mendel 17).  Dukes focuses primarily on offering guests a wide selection of craft beers and live music. (Id.).

Tampa Food and Entertainment, Inc. is a private, for-profit corporation that was established on August 4, 2010. (Mendel Ex .1).  The business operates Truth Lounge ("Truth"), a gentlemen's club located at 4202 W. Cayuga Street, Tampa, FL. 33614. (Mendel 10-11).  Truth was purchased in or about 2016. (Mendel 16).

---

[1] Citations to deposition transcripts relied upon in support of this motion will be made by reference to the party's or the witness's last name, followed by the page number of the transcript or exhibit number.

At all times relevant to this case, Louis Mendel ("Mendel") directly or indirectly exercised control over significant aspects of the day-to-day operations of Scores, Showgirls, Truth, and Dukes, which are all separate companies. (Mendel 15).

### B. Honey Hole Entertainment

In or about 2005, Plaintiff Jason Lange ("Lange") was introduced to Mendel. (Mendel, 25). At that time, Lange was operating a promotions company called Honey Hole Entertainment ("Honey Hole"). (Lange 13). Honey Hole specialized in promoting events at nightclubs throughout the Tampa Bay area. (Lange 10). Shortly after being introduced to Mendel, Honey Hole began organizing and promoting events at some of Defendants' establishments. (Mendel 25-26). Although Lange does not recall whether Defendants paid him directly or through his company when providing these services, he acknowledges that he worked as an independent contractor during this time. (Lange 12-13).

### C. Lange was retained by Defendants to Provide Social Media Marketing and Other Marketing Related Services for Defendants.

In or about 2015, Lange approached Mendel about the possibility of handling Defendants' social media marketing and other marketing-related efforts. (Mendel 27). At that time, Defendants were contracting with other entities and/or third parties to handle their marketing services. (Mendel 28). Specifically, Defendants contracted with Revital Agency, Christian Rodriguez, and Regis Gillespie. (Mendel 28). Each of these third parties were responsible for Defendants' marketing efforts, including organizing and hosting various promotional events. (Mendel, 28).

Recognizing that Mendel was dissatisfied with the direction of Defendants' marketing, Lange approached Mendel about the opportunity of handling their marketing efforts. (Lange

14, Ex. 11).  On June 13, 2015, Lange sent Mendel an email through his Honey Hole email account that provided "a brief overview" of the services that Lange could provide for Defendants. (Lange Ex. 11). Specifically, Lange offered to serve as the "Director of Marketing," where he would perform, in part, the following services: create, implement, and execute local content calendar for promotions; oversee the implementation of a marketing strategy; manage a social media presence and direct programs to improve social media reputation and recognition; chaperone entertainers to and from events, tradeshows, and branding opportunities; continuously conduct analysis of competitive environment and consumer trends; coordinate events/bookings; develop and implement brand strategy; and provide strategy, development, and consulting to assist in brand awareness. (Lange Ex. 11).

Believing that Lange was in the business of providing marketing-related services, Mendel agreed to have Lange perform these services for Scores, Dukes, and Showgirls. (Mendel Ex. 5, 6). As the Director of Marketing, Defendants agreed to pay Lange $750 per week. (Mendel 34). Per their arrangement, Defendants did not require Lange to work a certain number of hours and/or adhere to a particular work schedule. (Mendel 86).  He was free to come and go as he pleased. (Id.; Lange 37).  He was free to work for other companies. (Mendel 84). He was free to work from his own office. (Mendel 85). And he was free to outsource his work to his own staff. (Id.).

### D.  Formation of CFL and Tampa SEO Agency

In or about February 2015, Lange founded Tampa SEO Agency ("Tampa SEO").[2] (Lange Ex. 2). Tampa SEO is in the business of providing "digital, marketing, print, and

---

[2] During his deposition, Lange testified that Tampa SEO was not established until 2018. (Lange 16).  But despite his testimony, Cheri Read and Autumn Buehler testified that they were both employed by Tampa SEO in 2016.

advertising initiatives." (Id.). Tampa SEO specializes in providing branding, content marketing, email marketing, local SEO services, online reputation management, search engine marketing, social medial marketing, website development, and website design. (Id.).

In or about January 2016, Lange founded CFL Print, Inc. ("CFL"). (Id.). CFL was a multi-location print shop located throughout central Florida. (Id.). CFL specialized in the production and design of printed materials. (Lange 94).

Lange served as the owner and operator of both of these entities. (Lange 4). He maintained an office near Westshore, which was later moved to the Channel District. (Read 13). He staffed both businesses with the following individuals:

### a.  Cheri Read

Cheri Read ("Read") met Lange while she was working at Scores as a street marketer. (Read 99-100). In this role, Read was responsible for distributing free admission cards to prospective customers. (Read 16). When a customer tried to redeem the admission card, Read would receive $5 to $10 from the valet for each person who presented a card at the door. (Read 16, Mendel 43). After some time, Read was able to renegotiate a flat fee of $400 per week to perform these same services. (Read 28; Mendel 43). Read performed these duties on a part-time basis during the relevant time period. (Read 45).

In or about June 2016, Lange offered Read a position as Marketing Manager[3] of CFL and Tampa SEO. (Read 24-25, Ex. 5). The position required Read to work approximately five

---

(Buehler 23; Read 122). His Linked-in resume states that he was operating under the name of Tampa SEO in February 2016 (Lang Ex. 2). Lange also sent Read an email dated September 28. 2016, that established the rate sheet that Tampa SEO was charging its customers for providing these services. (Read Ex. 7).

[3] Read testified that she did not have an official title when working for CFL or Tampa SEO.  (Read 104-105). Instead, the "Marketing Manager" title was the title that Lange included on her business cards. (Read 104-105).

days a week. (Read 25-26). Her regular work schedule was from 10:00 a.m. to 4:00 p.m. (Read 26), and she was paid $15 per hour. (Read 100). Defendants did not play any role in her hiring. (Mendel 87).

As the Marketing Manager, Read was primarily responsible for handling social media marketing for CFL and Tampa SEO.[4] (Read 17, 24, 30). While working in this capacity, Read regularly performed social media marketing for the following clients: Scores, Showgirls, Truth, Dukes, 1916 Irish Pub, Acid Flyers, and Bay Area Tile. (Read 31-32, 73). Read performed these duties until her employment ended in October 2018, and she was paid by check, cash or PayPal from "CFL, Tampa SEO, or [Lange]." (Lange 29). She was not paid by Defendants for providing any social media marketing during her employment with CFL and Tampa SEO. She also was responsible for driving Lange around for approximately 5 to 6 months after he had lost his license. (Read 51; Guerrero 16).

**b. Gabe Guerrero**

In or about August 2016, Gabe Guerrero, who is a long-time friend of Lange, was hired by CFL. (Guerrero 26). During his employment, Guerrero was responsible for generating leads, attracting clients, and completing print orders. (Guerrero 12). He was paid on an hourly basis and worked approximately 25 to 30 hours a week. (Id.).

While working for CFL, Guerrero provided limited social media marketing for CFL and Tampa SEO. (Guerrero 77, Ex. 2, 6). On a few isolated instances, Guerrero testified that he prepared the menu for Scores – including preparing all of its graphic designs (Guerrero 49), and he made few social media posts for Defendants through his personal social media accounts.

---

[4] Lange testified that Ms. Read's duties consisted of facilitating email responses, performing "some social media marketing, some social media scheduling, and she drove [him] around." (Lange 24).

(Guerrero 77). Like Read, Guerrero also drove Lange for a period of time. (Guerrero 16). Lange paid him directly for these services. (Guerrero 55-56).

### c.   Autumn Buehler

Buehler met Lange while working as a "house mom" for Scores.  (Buehler, 13-16). After leaving Scores, Lange offered her a full-time position to serve as the Creative Director for CFL. (Buehler 17-20, Ex. 1). At the time, Buehler had her Bachelor of Arts in graphic design from USF. (Buehler 10). Buehler accepted the position in August 2016 and was paid on an hourly basis. (Buehler 20-21).

Shortly thereafter, in or about October 2016, Lange made her the Creative Director of Tampa SEO. (Buehler 23). According to Buehler, the Creative Director position was the same position that she was performing for CFL, but just for a different company. (Buehler 24).  In this role, Buehler paid the same hourly rate and was performing the same type of services. (Id.). She worked approximately 20 hours a week for Tampa SEO and CFL. (Buehler 28).

As the Creative Director, Buehler was responsible for creating and developing brands, and creating images for different marketing materials. (Buehler 23-24). Buehler testified that about half of her time was spent creating various graphic designs. (Buehler 59). Some of the clients that she worked with were Scores, Dukes, Showgirls, 1916 Irish, Limitless Fitness, Acid Flyers and Cater Tampa. (Buehler 26-27, 53-54).

### d.   Services Provided to Scores, Showgirls, Truth and Dukes.

On March 16, 2017, Lange sent an email to Mendel regarding an overview of the services that he was providing for Defendants on a daily basis. (Guerrero, Ex. 7). Those services are summarized in the following chart below:

| Description of Service | Responsible for Performing These Tasks at CFL or Tampa SEO |
|---|---|
| **Social Media Marketing**<br>• Scores Facebook (posts)<br>• Scores Twitter (posts)<br>• Scores Instagram (2 posts)<br>• Scores Google + (posts)<br>• Duke's Brewhouse Facebook (2-3 posts)<br>• Duke's Brewhouse Twitter (2-3 posts)<br>• Duke's Brewhouse Instagram (2-3 posts)<br>• Duke's Brewhouse Google (2-3 posts)<br>• Showgirls Facebook (1 post)<br>• Showgirls Twitter (1 post)<br>• Showgirls Instagram (1 post)<br>• 1916 Irish Pub Facebook (1-2 a day)<br>• 1916 Irish Pub Twitter (1-2 a day)<br>• 1916 Irish Pub Instagram (1-2 a day)<br>• 1916 Irish Pub Google + (1-2 a day)<br>• Truth Lounge Facebook (1-2 posts a day)<br>• Truth Lounge Twitter (1-2 posts a day)<br>• Truth Lounge Instagram (1-2) posts a day<br>• Truth Lounge Google + (1-2 posts a day) | • Jason Lange<br>• Cheri Read (Guerrero 53, Read 24)<br>• Gabe Guerrero (on a limited basis) |
| **Content Creation**<br>• Duke's Brewhouse Lakeland Facebook<br>• Content Management<br>• 11 images, flyers, Facebook covers, Twitter covers, retargeting images ($550 in comps). | • Jason Lange<br>• Cheri Read (Guerrero 54)<br>• Autumn Buehler (performed the graphic design work) (Buehler 16) |
| **Branding Materials**<br>• Printing: (last 4 days)<br>• Printing: (last 6 months) ($2,316.57 in discounts) ($468 in rush order/waive fees)<br>• Design and Layout Fees (last 6 months) ($978.04 in comps) | • Jason Lange<br>• Cheri Read (Guerrero 52)<br>• Gabe Guerrero (Guerrero 52-53)<br>• Autumn Buehler (Buehler 23-24) |
| **Networking**<br>• Transportation: (last 4 days, $47 gas)<br>• Showgirls, Saturday<br>• Scores, Saturday<br>• Truth, Saturday<br>• Scores, Saturday<br>• Duke's Brewhouse, Sunday | • Jason Lange |

| | |
|---|---|
| • Scores, Sunday<br>• Truth, Sunday<br>• Scores, Monday | |
| **Off Site SEO** | • Jason Lange |
| **Technology & Communication**<br>• Spends roughly 6 hours a week on phone calls relating to different events, updates, and marketing directives a week with the employee of the brands | • Jason Lange |

See Guerrero Ex. 7.

Lange would also attend weekly meetings at Dukes. (Mendel 58-60). Although his attendance was not required, Mendel believed that Lange was attending those meetings to stay engaged, field questions, and get a better understanding of the needs of the organization. (Id.).

In exchange for these services, Lange was paid by Defendants as follows:

| **Scores** | **Dukes** |
|---|---|
| • Involved in "promotions, marketing, advertising, outings, meetings, and social medial creations." (Lange, 40)<br>• Paid $900[5] per week and received free meal. (Lange, Ex. 6) | • Performed social media marketing, social media creation, local SEO creation, verification of citations, and attend meeting once a week. (Lange, 32-33)<br>• Paid $100 per week and a free meal. (Lange 33-34, Ex. 5). |
| **Showgirls** | **Truth** |
| • Performed social media marketing, and other small tasks. (Lange, 27)<br>• Paid $100 per week. (Lange, 28, Ex. 4). | • Served as the General Manager for several months in 2017. (Lange 46).<br>• Paid $1,000 per week.  (Lange Ex. 7) |

**e.  Lange's attempts to renegotiate pay structure with Defendants**

In or about 2017, Lange informed Defendants that he would no longer provide marketing-related services for Defendants because "he felt disrespected." (Mendel 27).

---

[5] Lange initially received $750 per week, which was later increased to $900 per week. (Lange Ex. 6).  The increase was due to Lange's demand for a higher weekly amount. (Mendel 37-38).

Approximately one week later, Lange informed Mendel that if they would like him to continue handling "the social media for the company," then he would need to be paid more money ($900/week from Scores; $100/week from Showgirls, and $100/week from Dukes), plus a free meal from both Scores and Dukes. (Mendel 38). Defendants agreed to this change. (Id.).

In June 2018, Lange approached Mendel about restructuring his business relationship. (Lange Ex. 9). In his proposal, Lange stated that he would like to oversee all of the marketing advertising operations for Defendants, including, but not limited to, building new websites, providing optimization, handing SEO, managing social media posts, creating and managing online content, and performing search engine audits. (Lange Ex. 9). In exchange for these services, Lange wanted to be paid $1,350 per week along with a small percentage of the profits. (Id.; Lange 54-55). Mendel rejected this proposal. (Mendel, 39; Lange 54-55). Instead, the parties continued under the current pay structure. (Id.).

### E.  Lange's Proposes to Temporarily Serve as the General Manager of Truth

In or about February 2017, Mendel was having problems attracting good talent to serve as the general manager at Truth. (Mendel 46-47). The first general manager was fired after Truth discovered that he was stealing from the company. (Id.). The second general manager was fired due to a host of work performance issues. (Id.).

Understanding that Mendel needed to make a change, Lange approached Mendel about serving as the general manager on a temporary basis. (Mendel 46-47). Lange proposed that he would perform the duties associated with the general manager position for a salary of $1,000 a week. (Mendel, 47). (Id.). As the general manager, Lange was responsible for hiring, supervising staff, managing the dancers, conducting payroll, handling inventory, creating the

work schedule, and conducting bank runs. (Id.; Lange 100). These duties were separate and apart from the marketing-related services that he was providing to Defendants and Truth. (Id.).

In or about May 2017, Lange recruited Ellis St. John to serve as the general manager of Truth. (Mendel 47). After Truth hired Ellis St. John, Lange agreed to work two or three shifts per week at a rate of $200 per shift until Truth hired another assistant manager. (Mendel 47-48). After Truth hired, Chris White, in or about July 2017, Lange came in about once a week to handle the weekly liquor orders and/or conduct bank runs. (Mendel 48).

While serving as the general manager, Guerrero performed some work for Truth at CFL's expense. (Guerrero 36-37, 40). Specifically, Guerrero testified that on a few occasions he assisted Lange in preparing sales forecasts on Excel and/or was asked to watch over the club while Lange conducted some errands. (Guerrero 37-39).

### F. Terminating Defendants' Contractual Relationship with CFL and Tampa SEO.

In October 2018, Mendel informed Lange that Defendants no longer wanted to outsource the companies' social media and marketing efforts. (Mendel 39, 73). Defendants wanted a full-time employee to work in the corporate office. (Id.). Defendants wanted more control over this position and wanted to hold the individual accountable. (Id.). Mendel offered the position to Lange, but he subsequently declined the offer. (Mendel 39). Consequently, Mendel informed Lange that Defendants would not be using his services after thirty days. (Id.).

Shortly after being informed of Defendants' decision to no longer use his services, Lange relayed this information to his employees, Read and Buehler. As Buehler testified, it was her understanding that Lange could no longer afford her services after Mendel terminated their business relationship.

> Q:      […] Why did you leave?
> A:      [Lange] explained to me that he could no longer afford to have me as a – as an employee?
> Q:      He explained to me that [Mendel] and Jamie [Rand] decided to no longer work with him.  So that was the only information that I received.  I don't know if there was more to that.

(Buehler, 20). Similarly, Read testified that her employment ended shortly after CFL and/or Tampa SEO were no longer going to perform social media and other marketing services for Defendants.[6]

> Q:      Do you know who fired Jason?
> A:      About a month previous, Jason told me that he had a month left working on the Scores accounts.
> Q:      Did you ask him what does that mean or anything like that or –
> A:      I said I guess we better get busy trying to find other accounts.
> Q:      Did you have a conversation about what that meant, like why it was happening or why he only had a month left.
> A:      Because Duke and Jamie [Rand] decided they want to start doing it in-house, I think. (Read 78).

Despite employing three employees to perform at least some of the services that Lange was retained to perform for Defendants, Lange filed a one count complaint alleging that he is entitled to overtime compensation. (Dkt. 1). As explained below, Lange cannot state a claim under the FLSA because he was clearly an independent contractor since he hired his own employees to perform some of the very services he agreed to perform for Defendants. Defendants are therefore entitled to summary judgment as a matter of law.

## III.     LEGAL ARGUMENT

---

[6]      On April 1, 2019, Cheri Read filed her first amended complaint against CFL and Tampa SEO alleging a claim for unpaid overtime. (Lange 59-60). On October 21, 2019, the parties reached a settlement where Lange agreed to pay Read $7,000.00 inclusive of unpaid wages and liquidated damages for her claims.  The court approved the settlement.

### A.  Lange was an Independent Contractor and Not an Employee of Defendants.

Section 207(a) of the FLSA provides, in relevant part:

[e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Thus, the Act imposes a minimum wage requirement and a provision for overtime compensation for all "covered employees." Id.

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).  It does not afford any protection to independent contractors.  29 C.F.R. § 779.233(b); Murry v. Playmaker Services, LLC, 512 F.Supp.2d 1273 (S.D. Fla. 2007). "An independent contractor differs from an employee in that an independent contractor is "in business for himself;" an employee is "dependent upon finding employment in the business for others." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1312 (11th Cir. 2013)

When determining the nature of an employment relationship under the FLSA, courts look to the "'economic reality' of whether the employee is economically dependent on the alleged employer." Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1348 (M.D. Fla. 1997) ("In deciding whether an individual is an 'employee' within the meaning of the FLSA, the label attached to the relationship is dispositive only to the degree that it mirrors the economic reality of the relationship."). "What is material is whether 'the work done, in its essence, follows the usual path of an employee." Hughes v. Family Life Care, Inc., 117 F. Supp. 3d 1365 (N.D Fla. 2015). "It is not significant how one 'could have' acted under the contract

13

terms.  The controlling economic realities are reflected by the way one actually acts." Id. (citing Usery v. Pilgrim Equip, Co., 527 F.2d 1308, 1312 (5th Cir. 1976).

The Eleventh Circuit uses six factors to guide the application of the economic reality test: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. Abreu v. Sunset Lake of Orlando Condominium Association, 2011 WL 13298536 (M.D. Fla. 2011); see also Harrell, 992 F. Supp. at 1348 (observing exotic dancers are obviously essential to the success of a topless nightclub as they are the "main attraction," unlike shoe shine boys at an airport who are not essential to the airport business).

While these factors serve as guides, the overarching focus of the inquiry is economic dependence. See e.g., Quarles v. Hamler, 652 Fed. Appx. 792 (11th Cir. 2016). In considering economic dependence, the court focuses on whether an individual is "in business for himself" or is "dependent upon finding employment in the business of others." See, e.g., Scantland, 721 F. 3d at 1312 citing Mednick v. Albert Enters., Inc., 508 F. 2d 297, 301-302 (5th Cir. 1975). Additionally, "the label attached to the relationship is dispositive only to the degree that it mirrors the economic reality of the relationship." See, e.g., Shaw v. Set Enterprises, Inc., 2017 WL 1380774 at *3 (S.D. Fla. 2017) (citation omitted).

**1) Defendants did not control how Lange provided his services.**

"The first factor considers the nature and degree of the alleged employee's control as to the manner in which the work is to be performed." Scantland, 721 F.3d at 1313. To determine "the nature and degree of control," courts have "examined whether workers may choose how much and when to work, whether they may hire their own employees, whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." Rodilla v. TFC-RB, LLC, 2009 WL 3720892, at *16 (S.D. Fla. 2009). "Control arises when the purported employer goes beyond general instructions and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." Dimingo v. Midnight Xpress, Inc., 325 F. Supp. 3d 1299, 1311 (S.D. Fla. 2018). "The nature and degree of an alleged employer's control over work performance matters to the extent that 'it shows that an individual exerts such control over a meaningful part of the business that [they] stand as a separate economic entity." Id.

Here, Lange was retained as the "Director of Marketing." (Mendel Ex. 5). His duties and responsibilities included providing a marketing platform for Defendants. He did not work a set schedule. (Mendel 39, 86; Lange 37). He could come and go as he pleased, and he often worked from his own office. (Id.). He employed his own employees to assist him (at least in part) in performing these services. (Read 24-26; Guerrero 26; Buehler 20-21). Defendants were not responsible for hiring these employees, nor were Defendants involved in the hiring process. (Buehler 34-35). Instead, these employees were employed by Lange at his direction and were paid directly by him or by one of his companies.

The evidence also establishes that Defendants never objected to Lange's practice of allowing his employees to perform any of the services provided to Defendants. (Mendel 84). Rather, the evidence shows that Read and Buehler frequently worked on matters for the

Defendants. (Buehler 26-28; Read 22). As the Court in Abreu v. Sunset Lake of Orlando Condominium Association, Inc., 2011 WL 13298536 (M.D. Fla. 2011), "[t]he fact that Plaintiff hired his own employees is compelling evidence that he was in control over the manner in which his work was performed, and therefore he was an independent contractor."

In his response, Lange will likely attempt to marginalize the tasks that were being performed by his employees and argue that their services only comprised a small part of his daily job duties. But as illustrated in an email that Lange sent to Mendel on March 16, 2017, Read and Buehler played a much larger role than what Lange may now suggest in this lawsuit. (Guerrero, Ex. 7). Lange will also have trouble explaining how Defendants maintained control over him, when, at minimum, he outsourced at least some of his assigned tasks to his own employees without objection. See Dimingo, 325 F.Supp.3d at 1312 (stating "the fact that [plaintiff] outsourced his work to individuals without any interference by the Defendants is indicative of the type of independence [plaintiff] had in complying with his responsibilities."). To allow an employee to outsource his assigned responsibilities at his or her expense to third parties would clearly disrupt the traditional norms of any employer-employee relationship.

Lastly, Lange will argue that the emails or text messages sent by Mendel directing Lange to make certain social media posts or perform various tasks demonstrate a level of control that he will argue exceeds the normal contractor relationship. Although Defendants don't dispute the fact that Mendel asked Lange on numerous occasions to perform various tasks and/or to get his approval before running certain promotions, the evidence clearly demonstrates that Mendel did not dictate how certain tasks would be completed or who was required to complete those tasks.

Accordingly, the evidence clearly establishes that Lange was in control of the manner in which he provided these services and merely because Mendel had expectations of the quality of the services being provided and/or whether certain promotions met his approval, this doesn't tilt the balance into Lange's favor.

### 2) Lange clearly controlled his opportunity for profit by hiring other individuals to perform some of the services provided to Defendants

In evaluating the second factor, the Court will consider the alleged opportunity for profit or loss depending upon [the individual's] managerial skill." Scantland, 721 F.3d at 1316. "[T]he opportunity for profit and loss has more to do with relative investments, with control over larger aspects of the business, and with like forms of initiative than with an individual's ability to earn tips or a higher hourly rate." Abreu v. Sunset Lake of Orlando Condominium Association, Inc., 2011 WL 13298536 (M.D. Fla. 2011).

In Abreu, the Court considered whether plaintiff, who was in the business of providing security services, was a contractor or an employee. When analyzing this factor, the Court stated:

> The record indicated that Plaintiff had exactly the kind of opportunity for profit or loss contemplated by this factor. First, he hired his own employees and he worked for-or was at least able to work for-other clients. […] Additionally, Plaintiff had the ability to affect his profit or loss because he negotiated the contract between his company and Sunset Lake. The fact that Plaintiff may have lost money because he had to hire additional guards which he did not account for during contract negotiations does not cause this factor to weigh in his favor. Plaintiff had the potential for profit or loss depending on how he managed the security company. Therefore, Plaintiff was in control of the larger aspects of his security business, and the fact that Plaintiff was paid by the hour does not override such control.

Abreu, 2011 WL at *4.

Like Abreu, the facts demonstrate that Lange had the opportunity for profit or loss. Lange's hiring of his own employees clearly provided Lange with the opportunity to further his profits. During the relevant time period, Lange hired three individuals, paid them an hourly

rate, and was free to pursue other work while these employees performed some of the marketing services for Defendants.

Moreover, CFL and Tampa SEO provided most of the same services that Lange agreed to provide to Defendants. Lange advertised these services through his companies. Read and Buehler testified that they performed services (social media marketing and graphic design) on behalf of CFL and Tampa SEO for Defendants and other clients. When Lange was questioned about Read's performance regarding social media marketing, he said:

> Q:      Okay. So, you were doing – you were hiring Ms. Read to do social marketing media, which you're not receiving payment from?
> A:      That's correct.  I received my own payment.
> Q:      From who?
> A:      From Mr. Mendel.
> Q:      Okay.  That is what I thought.  I was making sure. So, you're having Ms. Read perform these duties so she – so you can get those tasks done and then you're receiving your payment from Mr. Mendel?
> A:      Well that's how I'm compensated yes, sir.
> Q:      Okay.  And she wasn't doing any other social marketing media for anybody else; is that correct?
> A:       Oh, that's not correct:
> Q:      Well, in 2017 when she's working for CFL what other social media marketing was Ms. Read doing for CFL?
> A:      Whatever I instructed her to do, Full Color Print, Acid Flyers.  I mean she did other stuff too, but they were not paying customers.

(Lange, 95-96). According to Lange, he used the compensation he received from Defendants to pay, at least in part, the employees that he hired. In fact, Guerrero testified that there were a few weeks where Lange was behind on making payroll, which further shows a potential for loss. (Guerrero 71). This factor overwhelmingly supports that Lange was an independent contractor.

> **3)  The equipment and materials for providing his marketing related services were provided by Lange and/or his companies.**

Next, "[c]ourts may find independent contractor status when a worker invests in equipment or materials required for completing his tasks, or hires other workers to assist him in the completion of his tasks." Maldonado v. Callahan's Express Delivery, Inc., 2018 WL 398724, at *5 (M.D. Fla. 2018).

As discussed above, Lange hired three employees to perform various services on behalf of his companies, including social media marketing. See Dimingo, 325 F.Supp.3d at 1313 (finding the investment factor heavily favors a finding that the individual is an independent contractor when he recruits others to cover some of his duties for the company). He leased an office, supplied desktop computers, and maintained the software (i.e. Hootsuite) necessary to provide various marketing services. (Lange 17, 23, 37, 57; Guerrero 41-42; Read 101). Defendants did not reimburse him for these costs, nor did Defendants provide him with any of these materials.[7]  And Lange used this equipment, software programs, and materials for all of his clients, not only Defendants. This factor demonstrates that Lange was not dependent on Defendants, and warrants a finding that Lange was an independent contractor.

### 4) Defendants relied upon Lange's skill and qualifications to provide these services.

The "utilization of initiative and the employment of special skills indicates independent contractor status."  Artola v. MRC Express, Inc., 2015 WL 12672722, at *8 (S.D. Fla. 2015). "A worker with unique skills and the opportunity to exercise initiative is more likely to be able to operate as an independent business entity than an interchangeable worker who complete

---

[7] To the extent Lange relies on the fact that Mendel provided him with a credit card, those charges were for printing orders and for advertisements on a few social media websites.  Mendel would simply authorize Lange to use his credit card when he needed to run various advertisements on those websites.

routine tasks." <u>Id</u>. Accordingly, "[a] lack of specialization indicates that an individual is an employee, not an independent contractor." <u>Maldonado</u>, 2018 WL at *6 (M.D. Fla. 2006).

As advertised on his resume on Linked-in, Lange has "in-depth experience across multiple marketing disciplines, full-stack web developer, SEO, digital marketing, strategy, printing, promotions, sponsorships/events, and direct marketing." Through this experience, Lange approached Defendants about the opportunity of expanding their marketing efforts and social media presence. (Lange Ex. 11). Mendel relied on these representations when he retained Lange to provide these services.

While working for Defendants, Lange "[c]reated and executed a digital marketing strategy from the ground up." (Lange Ex. 2). He created and maintained "search marketing, content marketing, reputation management, social media marketing, and local SEO. (<u>Id</u>.). He provided "leadership and direction for advertising, brand awareness, production, media planning, database marketing, [and] market and customer research." (<u>Id</u>.). He developed and executed a marketing plan and marketing strategies to achieve overall benchmarks. (<u>Id</u>.). He also employed a graphic designer to create promotional materials for Defendants. By performing these duties, Lange was allowed to use his own decision-making authority and independent discretion (or at least that of his employees) to provide these services. Accordingly, Defendants' reliance on Lange's skill and qualifications weigh in favor of finding that he was an independent contractor.

### 5) Degree of permanency and working relationship

"The fifth factor considers the degree of permanency and duration of the working relationship." <u>Dimingo</u>, 325 F. Supp. 3d at 1313, <u>citing</u> <u>Scantland</u>, 721 F.3d at 1318. "Generally, a longer, more permanent working relationship weighs toward employee status,

whereas a finite, non-exclusive work relationship is indicative of independent contractor status because they allow for more economic independence." Id.

Although the working relationship lasted for approximately 2 years, Lange on several occasions attempted to negotiate a higher rate for his services. In fact, on one occasion, Lange informed Defendants that he was no longer going to provide any more work for Defendants. Approximately a week later, Lange presented them with a new pay-structure should they want to retain his services, which allowed him to receive additional compensation. (Mendel 37-38).

Lange's business relationship with Defendants also allowed him to pursue other job opportunities. As the record demonstrates, Lange provided social media marketing, branding, SEO services, and other related services to a host of clients and there was no evidence that his relationship with Defendants was exclusive. Cf. Quarles v. Hamler, 652 Fed. Appx. 792, 794 (11th Cir. 2016) (concluding that the plaintiff was an employee in part because the defendant employer told him that he could not work for anyone else). As the Court in Dimingo held, these facts weigh in favor of finding that Lange was an independent contractor. Dimingo, 325 F. Supp. 3d at 1314 (finding that despite receiving payment from the defendants for several years, the relationship was not exclusive and allowed him to seek other opportunities.)

**6)  The services provided by Lange were not integral to Defendants' operations.**

The last factor that the Court considers is whether Lange played an integral role in Defendants' business operations. Scantland, 721 F.3d at 1319. "The more integral the service, the more likely the worker is an employee." Artola, 2015 WL 12672722, at *10.

As discussed above, Lange was primarily retained to provide social media marketing, content creation, branding materials, and networking.  (Guerrero, Ex. 6). Although these services assist with attracting new business, they were not integral to the daily operations of those businesses.

Defendants were not in the business of providing social media marketing, branding, and other related services. They were not the primary services of the business. Cf. Harrell, 992 F. Supp. 1343 at 1352 ("Exotic dancers are obviously essential to the success of a topless nightclub."); Molina, 420 F. Supp. 2d at 1278 (holding that courier business "would have been unable to perform its business operations" without its couriers and therefore the couriers were an integral part of the business). They were secondary services and were designed only to generate additional business for Defendants. Accordingly, this factor weighs in favor of finding that Lange was an independent contractor.

7) **The reality of the economic relationship between Lange and Defendants clearly demonstrates that Lange was an independent contractor.**

The undisputed evidence clearly establishes that Lange served as an independent contractor. Those facts are summarized as follows:

- Lange owned and operated CFL and Tampa SEO, which specializes in providing social media marketing, branding, content marketing, printing, local SEO services, networking and communication.
- Lange offered and was retained by Defendants to provide these services based on his experience in the field and/or prior qualifications.
- Lange hired three individuals at his companies' expense to assist him in providing these services without any interference by Defendants.
- Because Lange didn't have an exclusive relationship with Defendants, he was able to obtain other job opportunities during the relevant time period.

Thus, the undisputed facts show that Lange was not economically dependent on Defendants. Instead, Lange operated two businesses that provided essentially the same services that Lange was providing for Defendants during the relevant time period.  Accordingly, the Court should find that Lange was an independent contractor, and therefore not entitled to overtime.

**B. Even if Lange was Considered an Employee, He would be Exempt under the Executive Exemption while working at Truth as the General Manager, thereby barring any recovery against Mendel, individually.[8]**

Much of Lange's argument in opposition to Defendants' motion for summary judgment will address the time he spent conducting bank runs, making liquor orders, or doing "whatever Duke needed." (Lange 45, 98, Ex. 12, Rog. 15). However, as Lange testified, those duties were limited to his involvement at Truth.

> Q:    Yes. Okay. But beyond time consumption, you were mentioning tasks here that you didn't have with the other locations.  You directed people to do certain things with regard to Truth; is that correct?
> A:    Directed as in?
> Q:    Were you a manager of Truth?
> A:    Yes, sir.
> Q:    Okay.  And you would agree you weren't a manager at either Scores or Tampa – at Duke's Brewhouse or at [Showgirls], but now you are, is that correct/
> A:    I have no manager – no manager duties any of the locations except for Truth.
> Q:    Okay.  And at Truth you were managing more than two people, is that correct?
> A:    Yes. (Lange, 46).

Lange temporarily served as the general manager of Truth beginning in February 2017. (Lange, Ex. 7). Lange approached Mendel about this opportunity in order to give Mendel more time to find a permanent replacement. As the general manager, Lange was responsible for managing Truth lounge, including supervising two or more employees/contractors. (Lange 46). In exchange for these services, Truth agreed to pay him $1,000 a week. (Lange Ex. 7). This arrangement was separate and apart from the marketing services that he was performing for Defendants and Truth.  Lange served in this capacity for approximately three months until

---

[8] Mendel filed a motion to amend his answer to add two affirmative defenses – executive exemption and creative professional exemption.  (Dkt. 27). On January 9, 2020, the Court granted Mendel's motion. (Dkt. 40).  On January 24, 2020, Scores, Showgirls, Truth, and Dukes filed a similar motion to amend their answer (Dkt. 43), and Plaintiff filed his opposition thereto. (Dkt. 46). Should the Court grant their motion, then Scores, Showgirls, and Duke join Mendel in the arguments set forth in sections B and C of this motion.

Truth hired Ellis St. John in or about May 13, 2017, as his replacement. (Id.). After hiring Ellis St. John, Lange agreed to work a couple of shifts a week for Truth at a rate of $200 per shift until the club was fully staffed. (Id.). Lange continued to work in this capacity until the end of July, 2017. (Id.). Lange also paid Guerrero through CFL to perform some duties at Truth while he served as the general manager. (Guerrero 36-40).

Even if the Court determines that Lange was an employee while he served as the general manager of Truth, Lange would still be exempt employee under the FLSA. The FLSA exempts an employee under the executive exemption from overtime requirements when his primary duty is the management of the enterprise of which he is employed and whose primary duty includes the customary and regular direction of at least two employees.  20 C.F.F. § 541.1. To satisfy this exemption, Lange must be:

1) Compensated on a salary basis at a rate of not less than $455 per week.
2) Whose primary duty is management of the enterprise in which the employee is employed;
3) Who customarily and regularly directs the work of two or more other employees; and
4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion of any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(1).

Here, Lange met the salary basis test as he was paid $1,000 per week before Truth hired Ellis St. John as his replacement. He primarily served as the general manager and directed two or more employees/contractors. Lange had the authority and/or gave recommendations to hire and fire employees. In fact, Mendel testified that Lange recruited and recommended the hire of Ellis St. John as his replacement. (Mendel 47-48). Accordingly, Lange is an exempt employee under the executive exemption during the time he served as the full-time general manager of Truth. Mendel therefore should be entitled to summary judgment.

**C. Even if Lange was Considered an Employee, He would be Exempt under the Creative Professional Exemption for time spent performing graphic design, thereby barring any recovery against Mendel, individually.**

To establish that Lange is exempt as a creative professional, Lange's primary duties must involve "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor," which includes "music, writing, acting, and graphic arts." 29 C.F.R. § 541.300(a)(1). Although Lange claims he was not responsible for creating graphic designs or promotional materials, the undisputed evidence establishes that he hired Buehler, at his own expense, to fill this role. According to Buehler, she was hired as the Creative Director for CFL and Tampa SEO. She created brand identities and marketing images for online and print materials. (Buehler 23). These duties required her to use her artistic ability and talent to create these materials that were used for the various marketing campaigns. (Buehler 40).

If the Court finds that Lange is an employee, then Lange should be exempt under the creative exemption. By outsourcing the graphic art design to one of his own employees, which he paid for at his own expense, Lange should be treated as if he was performing those duties. Since Plaintiff meets the salary basis test (that is, he received a salary of over $1,100 per week) and was primarily responsible for graphic art design through his co-worker Buehler, Lange would be exempt under the creative professional exemption.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Scores, Showgirls, Dukes, and Mendel, individually, respectfully request that the Court grant summary judgment in their favor.

Respectfully submitted,

/s/ Christopher M. Bentley
Christopher M. Bentley
Florida Bar No.: 052616

25

Johnson Jackson PLLC
100 N. Tampa St., Suite 2310
Tampa, FL 33602
Telephone: (813) 580-8400
Facsimile: (813) 580-8407
Email: cbentley@johnsonjackson.com
        Secondary Email: jshinn@johnsonjackson.com
**Counsel for Defendant, Louis Mendel**

/s/ G. Michael Nelson
Florida Bar No.: 0559180
Nelson, Bisconti & McClain, L.L.C.
1005 North Marion Street
Tampa, FL 33602
Phone: (813) 221-0999
Facsimile: (813) 314-9626
Email: gmnlaw@hotmail.com
**Counsel for Defendants Tampa Food and Hospitality, Inc., Plant City Hospitality, Inc., Duke's Brewhouse, Inc. and Tampa Food & Entertainment, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of March 2020, a true and correct copy of the foregoing was served using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/Christopher M. Bentley
Attorney