# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JASON LANGE,

               Plaintiffs,                            Case No. 8:19-cv-34-CEH-CPT

v.

TAMPA FOOD AND HOSPITALITY,
INC., PLANT CITY HOSPITALITY, INC.,
DUKE'S BREWHOUSE, INC., TAMPA
FOOD & ENTERTAINMENT, INC.,
and LOUIS MENDEL,

               Defendants.

_____/

## <u>ORDER</u>

This matter comes before the Court on the parties' cross motions for summary judgment. Defendant Tampa Food & Entertainment, Inc. filed a Motion for Summary Judgment (Doc. 48), Plaintiff responded in opposition (Doc. 61), and Defendant replied (Doc. 68). Defendants Tampa Food and Hospitality, Inc.; Plant City Hospitality, Inc.; Duke's Brewhouse, Inc.; and Louis Mendel filed a Motion for Summary Judgment (Doc. 49), Plaintiff responded in opposition (Doc. 62), and Defendants replied (Doc. 66). Plaintiff Jason Lange filed a Motion for Partial Summary Judgment (Doc. 55), Defendants responded in opposition (Doc. 63), and Plaintiff replied (Doc. 67). Defendants seek summary judgment on all issues (Docs. 48, 49); Plaintiff seeks partial summary judgment on his status as an employee under

the FLSA, the inapplicability of exemptions to him, and liquidated damages.  Doc. 55.

The Court, having carefully considered the motions, being duly advised in the premises and for the reasons described herein, will grant in part and deny in part the parties' motions.

## I.    BACKGROUND AND FACTS[1]

### A. The Parties

Defendant Tampa Food and Hospitality, Inc. is a private, for-profit corporation that was established January 1, 2016. Doc. 90, ¶ 2. The business operates Scores ("Scores"), a gentlemen's club located in Tampa, Florida. *Id.* Defendant Plant City Hospitality, Inc. is a private, for-profit corporation that was established on January 1, 2016 and operates Showgirls Men's Club ("Showgirls"), a gentlemen's club located in Plant City, Florida. *Id.* ¶ 3.  Defendant Duke's Brewhouse, Inc., is a private, for-profit corporation that was established on March 24, 2015 that operates Duke's Brewhouse ("Duke's"), a sports bar and local eatery. *Id.* ¶ 4.  Duke's focuses primarily on offering guests a wide selection of craft beers and live music. *Id.* Tampa Food & Entertainment, Inc., is a private, for-profit corporation that was established on August 4, 2010. *Id.* ¶ 5. The business operates Truth Lounge ("Truth"), a gentlemen's club located in Tampa. *Id.* Truth was purchased in or about 2016. *Id.* At all times relevant, Defendant Louis

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including depositions, interrogatory responses, declarations, and exhibits (Docs. 48–55; 61–64; 66–68), as well as the parties' Stipulations of Agreed Material Facts (Docs. 60, 90).

Mendel ("Mendel") directly or indirectly exercised control over significant aspects of the day-to-day operations of Scores, Showgirls, Truth, and Duke's (collectively "Defendant businesses"), which are all separate companies. *Id.* ¶ 6. Mendel is the decision maker for the Defendant businesses. *Id.* ¶ 7. Mendel goes by "Duke." Doc. 51 at 4:17. At all relevant times, Defendants were enterprises covered by the FLSA, as defined by 29 U.S.C. § 203(r) and 203(s). Doc. 90, ¶ 23.

In or about 2005, Plaintiff Jason Lange ("Plaintiff") was introduced to Mendel. *Id.* ¶ 12. At the time, Plaintiff was operating a promotions company called Honey Hole Entertainment ("Honey Hole"), which specialized in promoting events at nightclubs throughout the Tampa Bay area. *Id.* ¶ 13. Shortly after being introduced to Mendel, Honey Hole began organizing and promoting events at some of Defendants' establishments. *Id.* ¶ 14. Although Lange does not recall whether Defendants paid him directly or through his company Honey Hole, he acknowledges that he worked as an independent contractor during this time frame. *Id.* ¶ 15.

**B. Defendants Hire Plaintiff**

Defendants hired or retained Plaintiff to do all of the Defendant businesses' social media and to possibly go out with the girls to different events. *Id.* ¶ 17. He worked for the Defendant businesses from approximately June 2015 until the end of October 2018.[2] *Id.* ¶ 20. Plaintiff offered to serve as the "Director of Marketing," where he would perform, in part, the following services for Defendants: create, implement,

---

[2] Although he began work for Defendants in June 2015, Plaintiff's overtime claim is limited to January 2016 through November 2018. Doc. 17 at 1.

and execute local content calendar for promotions; oversee the implementation of marketing strategy; manage a social media presence and direct programs to improve social media reputation and recognition; chaperone entertainers to and from events, tradeshows, and branding opportunities; continuously conduct analysis of competitive environment and consumer trends; coordinate events/bookings; develop and implement brand strategy; and provide strategy, development, and consulting to assist in brand awareness. *Id.* ¶ 18.

## C. Hours worked, Payments Received, and Job Responsibilities

In his answers to Court interrogatories, Plaintiff states he worked on average 50 to 60 hours per week for Defendants and was paid "about $1,200 - $1,300 per week from the different entities" Doc. 17 at 1. He averages that he worked ten to twenty hours in overtime hours per week from January 2016 until November 2018. *Id.*

Plaintiff was paid a set weekly amount for the various duties he was required to perform. Doc. 90, ¶ 19. Plaintiff never received overtime compensation while working for Defendants. *Id.* ¶ 21. Plaintiff was paid either by cash or personal check to him personally for his social media marketing and miscellaneous duties. *Id.* ¶ 22. Plaintiff testified that he "wasn't hired to do social media work." Doc. 50 at 68:20. He was hired to do whatever Mendel wanted him to do: "whether that was going to pick up laundry, whether that was going to the bank. Social media marketing was a very, very small part of [his] overall duty." *Id.* at 68:20–24. Taxes were never deducted from his checks. *Id.* at 91:16–19. Plaintiff testified he received some 1099's after he was terminated from Defendants, but never during his employment. *Id.* at 93:3–8.

4

Until June 2016, Plaintiff was paid by one company, Scores, $750 per week for all the locations, but after June 2016, Plaintiff received payments directly from the different companies. Doc. 50 at 34:18–25. Summaries of payments made from each of the businesses to Plaintiff were attached to his deposition. Docs. 50-4, 50-5, 50-6, 50-7. From January 2016 until November 2018, Defendants paid Plaintiff $171,945. *Id.*

1. *Plant City Hospitality (Showgirls)*

Regarding Showgirls, Plaintiff's responsibilities included social media marketing and digital marketing for the Showgirls' brand, attending some meetings, transporting files, sales records, petty cash, bringing things to the Showgirls' warehouse storage weekly or more often if needed. Doc. 50 at 26:20–28:5. Plaintiff was paid weekly from July 19, 2018 until October 29, 2018.[3] Doc. 50-4. He received $100 weekly payments (except the first week was $200) for a total of $1,700.00. *Id.* He was sometimes given specific instructions on the social marketing such as a text from Mendel directing him to post an event on Facebook. Doc. 50 at 28:14–24. Sometimes he would give those tasks to Cheri Read ("Read") to perform, and Plaintiff or one of his companies would pay her for that. *Id.* at 28:25–29:19. Plaintiff did not punch a time clock or have a set schedule. *Id.* at 31:14–23. He did not work onsite at Showgirls. *Id.*

2. *Duke's Brewhouse, Inc. (Duke's)*

---

[3] Plaintiff could confirm he was paid weekly but could not confirm the dates as he was paid by another company prior to that. He testified the changes occurred so that one company was not absorbing all of his salary. Doc. 50 at 32.

Plaintiff's specific duties for Duke's included social media marketing, social media creation, local SEO (search engine optimization) creation, verification of citations, attending meetings at various Duke's locations, and doing anything Mendel told him to do. Doc. 50 at 32:24–33:12. Read would assist him with the social media marketing for Duke's, and she would occasionally attend meetings when requested. *Id.* at 35:21–36:10. The summary of payments received by Plaintiff from Duke's Brewhouse Plant City reflects he was paid $100 per week from June 3, 2016 through October 14, 2016; from July 21, 2017 through December 29, 2017; and March 2, 2018 through October 29, 2018. Doc. 50-5. The amounts paid for this time frame total $7,685. *Id.* Plaintiff testified he was paid in cash. Doc. 50 at 33:21–25. He also was entitled to a weekly meal. *Id.*; Doc. 50-5 at 2. He did not punch a time clock and did not have a strict schedule. Doc. 50 at 36:24–37:6.

3. *Tampa Food and Hospitality (Scores)*

Plaintiff testified that when he first started working in January 2016, his responsibilities included "[p]romotions, marketing, advertising, outings, meetings, social media creations." Doc. 50 at 40:12–14. Until June 2016, he was working and getting paid by Scores for work he did for all of the companies. *Id.* at 39:17–40:1. Plaintiff could not estimate how much time in January 2016 was spent doing work for Scores versus one of the other establishments. *Id.* at 41:18–42:3. He did not have an assigned schedule that required him to check in at Scores. *Id.* at 16–20. Plaintiff would text Mendel numerous times a day and would receive his instructions from Mendel or

one of the property managers. *Id.* at 40:24–41:1. Read would help with the social media for Scores. *Id.* at 45:5.

Plaintiff was paid $750 weekly by Tampa Food and Hospitality beginning in January 2016. Doc. 50-6. Starting July 19, 2016, he was paid $850 per week. *Id.* at 1. Beginning July 11, 2017, he was paid on average $900 per week until October 30, 2018.[4] *Id.* at 2–4. The last payment he received was November 5, 2018 for $1,100. *Id.* at 4. The total of the payments for that time period equals $131,900. *Id.*

4. *Tampa Food & Entertainment (Truth)*

In or around February 2017, Mendel was having problems attracting good talent to serve as general manager for Truth Lounge. Doc. 90, ¶ 40. The first and second general managers were fired, but not by Plaintiff, for theft and performance issues, respectively. *Id.* ¶¶ 41, 42. Plaintiff approached Mendel and proposed serving as interim manager on a temporary basis, which he did for approximately six months until July 25, 2018.[5] *Id.* ¶¶ 43, 45. After July 25, 2018, Plaintiff was no longer considered the interim general manager but worked as one of the day managers for

---

[4] It appears in some instances that Plaintiff was paid a higher amount, but then the next check would account for it by reducing the standard amount. Consistent with that, Plaintiff testified he received a loan from Mendel when he started working for Scores. His regular pay initially was $750, but his first check was $900. The next week his check was $600 representing a $150 deduction for the prior week's $150 loan. Thereafter, his weekly pay returned to $750.

[5] Plaintiff did not work in a managerial capacity at any of the other Defendant establishments, except Truth Lounge. Doc. 50 at 46:11–17. Based on the summary of payments, it appears Plaintiff worked full-time as the interim general manager from February to May 2017. Doc. 50-7.

Truth. *Id.* ¶ 45. As a day-manager, Plaintiff was required to continue handling Defendants' banking, liquor orders, and helping with payroll. Doc. 51 at 79:2-7.

Beginning in February 2017, Plaintiff was responsible at Truth for "[h]iring,[6] liquor, payroll, inventory, social media marketing, . . . banking every day, . . . go by the venue, pick up cash, count the cash in front of the manager, take the cash to the bank, get ones, cash petty cash checks, clean up around the place, . . . organize, clean." Doc. 50 at 45: 17–23. He managed more than two people. *Id.* at 46:18–20. He was paid $200 per shift while working for Truth, and $1000 for working five shifts. *Id.* at 47:10–20. At some point later in May 2017, he began to work only three shifts per week and was paid $600. *Id.* at 48:5–8. He worked eight to ten hours per shift. *Id.* at 48:9–13. Once Mendel hired Ellis St. John as general manager, St. John "took over the reins." *Id.* at 48:23–49:1. Mendel testified that Lange recruited St. John to serve as the general manager. Doc. 51 at 47:23–24.

The summary of Plaintiff's payments from Tampa Food & Entertainment reflect that generally he was paid $1000 per week for approximately three months from from February 3, 2017 until May 13, 2017. Doc. 50-7. Thereafter, he was paid varying amounts from $600 to $1000 per week until July 2017.[7] *Id.* Beginning July 25, 2017 until July 3, 2018, Plaintiff was paid $100 to $200 per week, with an occasional

---

[6] Although he testified that "hiring" was one of his responsibilities, Plaintiff denies that he hired or fired anyone while working as a manager at Truth. Doc. 50 at 47:8–9.
[7] Plaintiff was paid $700 on May 19, 2017; $600 on May 24 and June 2, 2017; $1000 on June 9, 2017; $600 on June 15, June 23, and June 30, 2017; $800 on July 7 and July 18, 2017. Doc. 50-7.

payment of $250 and $300. *Id.* The total payments he received from Truth totaled $36,660. *Id.*

### D. Plaintiff's Termination

In or around September 2018, Mendel informed Plaintiff that Defendants would not be using his services after 30 days. Doc. 90, ¶ 55.

### E. Plaintiff's Businesses

Plaintiff served as owner and operator of limited liability companies, CFL Print and Tampa SEO. Doc. 90, ¶ 26; Docs. 62-2, 62-3. Tampa SEO is in the business of providing "digital, marketing, print and advertising initiatives." Doc. 90, ¶ 24. It specializes in providing branding, content marketing, email marketing, local SEO services, online reputation management, search engine marketing, website development, and website design. *Id.* ¶ 24. CFL Print specializes in the production and design of printed materials. *Id.* ¶ 25. For these businesses, Plaintiff maintained an office near Westshore Blvd., Tampa, which later moved to the Channel District. *Id.* ¶ 27. Defendants did not make payments to Plaintiff's businesses, CFL Print or Tampa SEO, for the social media marketing and miscellaneous duties that Plaintiff did. Doc. 51 at 84:8-17, 38:1-13.

### F. Other Individuals who worked for Plaintiff and/or Defendants

Christina Autumn Buehler ("Buehler") met Plaintiff when she was working as a "house mom" for Scores. Doc. 90, ¶ 36; Doc. 54 at 5:9–13, 12:10–14, 16:18–20. She worked approximately 20 hours per week for Plaintiff's companies, Tampa SEO and

CFL Print.  Doc. 90, ¶ 38. She testified that about half of her time was spent creating various graphic designs. *Id.* ¶ 39. She worked for Plaintiff as the creative director of CFL Print from August 2016 until November 2018. Doc. 54 at 19:11–21. She worked as the creative director of Tampa SEO beginning in October 2016. *Id.* at 23:7. According to Plaintiff, Buehler performed piece work for his companies as an independent contractor, not an employee, and was paid $425 weekly for her services, not on an hourly basis. Doc. 62-1, ¶¶ 4, 5.

Cheri Read ("Read") worked for Scores as a street marketer in which she would distribute free admission cards to prospective customers. Doc. 90, ¶ 28. Read would receive $5 to $10 from the valet for each person who presented a card at the door. *Id.* At some point, Read renegotiated a flat fee of $400 per week to perform these street marketing services for Scores during the relevant time. *Id.* ¶ 29. Some time in June 2016 Plaintiff hired Read to do social media posting for the Defendant businesses. Doc. 52 at 24:13–25:4. Defendants did not play any role in Read being hired with CFL Print or Tampa SEO. Doc. 90, ¶ 31. Read worked from Plaintiff's office located near Westshore Blvd until the office moved. Doc. 52 at 25:13–18. She stopped working for Plaintiff in October 2018. *Id.* at 25:21–24.  While working for Plaintiff, Read handled social media posts for Acid Flyers, a pizza place, Tampa SEO, CFL Print, 1916 Irish Pub, Duke's Brewhouse, Scores, Showgirls, Truth Lounge, and Bay Area Tubs. *Id.* at 29–32. While she worked for Plaintiff, CFL Print paid Read by paying her company, Skyblue Entertainment. *Id.* Plaintiff claims Read was an independent contractor.  In a

separate lawsuit, Read sued Plaintiff for unpaid overtime and FLSA violations claiming she was an employee. Doc. 50 at 59–60.

Gabe Guerrero ("Guerrero"), a long-time friend of Plaintiff, was hired in or about August 2016 by CFL Print. Doc. 90, ¶ 33. His primary duties for CFL Print were to find customers and make sales. *Id.* ¶ 34. The entire time Guerrero worked with CFL Print, he also worked as a nightclub promoter. *Id.* ¶ 35.

Amber Peacock ("Peacock") was hired by Duke's Brewhouse in November 2015 and continues to be employed by Duke's Brewhouse as an employee. *Id.* ¶ 46. She became director of marketing for Duke's Brewhouse in or around November 2018. *Id.* ¶ 50. She is paid a salary of $1,000 per week. *Id.* ¶ 48. She does not have a company credit card nor does she have access to Defendants' bank accounts. *Id.* ¶ 47. Peacock has gone on approximately fifteen promotional events since becoming director of marketing. *Id.* ¶ 50.

Brandy Phillips ("Phillips") conducted the photo shoot for Duke's Brewhouse menu and advertisements in March 2016. *Id.* ¶ 51. Phillips has conducted approximately forty-five photo shoots for Defendants. *Id.* ¶ 52. Phillips has created multiple graphic designs for Defendants, all of which require Mendel's final approval before payment is made to her. *Id.* ¶ 53. Phillips has never been paid in cash. *Id.* ¶ 54.

Edward Valenti ("Valenti") is the owner of EV2 Agency. Doc. 90, ¶ 8. Valenti has been creating graphic design and print work for Mendel and Defendants for the

last 18 years. *Id.* ¶ 9. Valenti is paid $60 per hour for his services, and payments are made to EV2 Agency. *Id.* ¶¶ 10, 11.

### G. Pleadings

Plaintiff filed a Complaint against Defendants on January 7, 2019, seeking unpaid overtime compensation, liquidated damages, costs and attorneys' fees pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b) ("FLSA"). Doc. 1. Plaintiff alleges Defendants violated the FLSA by misclassifying him as an independent contractor and by not paying him overtime compensation for overtime hours worked from January 2016 until November 2018. *Id.* ¶ 19; Doc. 17. He asserts the decision to misclassify him as an independent contractor was intentional, willful, and unlawful, entitling him to liquidated damages. Doc. 1, ¶¶ 37–39.

Defendants answered the Complaint on February 14, 2019. Doc. 9. In their Answer, they raise four affirmative defenses: (1) Plaintiff is an independent contractor; (2) Defendants did not act in bad faith; (3) Defendants are entitled to a set-off for any wages or other compensation received by Plaintiff; and (4) the court lacks subject matter jurisdiction. *Id.* at 4. On November 26, 2019, Defendant Mendel moved to amend his answer to add the affirmative defenses of the executive and creative professional exemptions. Doc. 27. Although the time for amendments to pleadings had expired, Mendel argued that an amendment was warranted primarily because the formal discovery he received from Plaintiff in November 2019 revealed that Plaintiff is seeking overtime wages for the time spent performing activities that would fall within one or both of these exemptions. *Id.* at 2. The motion was granted by the

Magistrate Judge, after a hearing, and Defendant Mendel filed his amended answer and affirmative defenses on January 13, 2020. Doc. 41.

On January 21, 2020, Plaintiff objected to the Magistrate Judge's Order. Doc. 42. On January 24, 2020, the remaining Defendants sought leave to amend their affirmative defenses to similarly assert the applicability of the executive and creative professional exemptions. Doc. 43. The Court entered an Order overruling Plaintiff's Objection as the Magistrate Judge found Mendel had demonstrated good cause for the delay in seeking leave to amend. Doc. 65. The Court denied the remaining Defendants' motion to amend their answer. *Id.* Although these Defendants argued they thought Mendel's motion applied to them, they did not attend the hearing on Mendel's motion and did not seek leave to amend until nearly two months after Mendel raised the issue. *Id.*

On March 31, 2020, Defendants moved for summary judgment in their favor on all claims. Docs. 48, 49. Tampa Food and Hospitality, Inc.; Plant City Hospitality, Inc.; Duke's Brewhouse, Inc.; and Louis Mendel move for summary judgment arguing Plaintiff is not an employee under the FLSA. They argue instead that Plaintiff worked as an independent contractor using his own companies and employees to perform the various social media marketing services for Defendants. Doc. 49. Additionally, Defendant Mendel argues that to the extent that Plaintiff is considered an employee at Truth, the executive and professional exemptions apply such that Plaintiff would be an exempted employee for purposes of overtime wages.

13

Defendant Tampa Food & Entertainment, recognizing that it is in a slightly different posture than the other Defendants, filed a separate Motion for Summary Judgment also claiming that Plaintiff acted as an independent contractor. Doc. 48. But even if Plaintiff's shift work as a manager for Truth qualifies him as an employee under the FLSA, this Defendant argues the executive and creative professional exemptions apply to bar Plaintiff's overtime wage claims.

In his motion for partial summary judgment, Plaintiff seeks judgment in his favor (1) on his status as an employee entitled to overtime wages, (2) finding that the executive and creative professional exemptions do not apply to him, and (3) finding that he is entitled to liquidated damages. Doc. 55.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex,* 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id*. The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual

15

dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts.  *Id*. at 1555-56.

## III.   DISCUSSION

The FLSA states that, except as otherwise provided,

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce . . . or is employed in an enterprise engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Time and a half overtime pay is the presumed amount to which workers are entitled as overtime pay.  *Falken v. Glynn Cty., Ga.*, 197 F.3d 1341, 1345 (11th Cir. 1999).  "The overtime wage provisions of the FLSA apply only to workers who are 'employees' within the meaning of the Act."  *Tafalla v. All Fla. Dialysis Servs., Inc.*, No. 07-80396-CIV, 2009 WL 151159, at *5 (S.D. Fla. Jan. 21, 2009) (quoting 29 U.S.C. § 206(a)(1)).  An employee is defined by the FLSA as an "individual employed by an employer." 29 U.S.C. § 203(e)(1). An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d).  An independent contractor is not an "employee" for purposes of the FLSA's overtime and minimum wage protections. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). Defendants contend Plaintiff worked as an independent contractor.  Plaintiff argues he was an employee who worked 50 to 60 hours per week for Defendants and who never was paid overtime pay for the weekly hours he worked in excess of 40 hours.

"To determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Id.* (citing *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)). The Eleventh Circuit has identified six factors that guide courts in applying the economic reality test:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Scantland*, 721 F.3d at 1312. However, the court recognized that "the overarching focus of the inquiry is economic dependence." *Id.* "[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Id.* (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)).

The parties apply the six-factor test in their motions, and the Court will apply them here, recognizing that these factors are not exclusive, and no single factor is dominant. The Court turns first to the motion filed by Mendel and the Defendant businesses Scores, Showgirls, and Duke's.

**A.    Motion for Summary Judgment by Tampa Food and Hospitality, Inc.; Plant City Hospitality, Inc.; Duke's Brewhouse, Inc.; and Louis Mendel (Doc. 49)**

*1. Nature and Degree of Control*

The first factor of the economic reality test considers the "nature and degree of the alleged employer's control as to the manner in which the work is to be performed." *Scantland*, 721 F.3d at 1313. In their motion, Mendel and Defendant businesses Scores, Showgirls, and Duke's contend that they did not control how Lange provided services. Specifically, he did not work a set schedule, he did not punch a time clock, he could come and go as he pleased, he often worked from his own office, and significantly, he hired others to assist him in performing services for Defendants that he was hired to do. Defendants submit that they never objected to Plaintiff outsourcing some of his work for their businesses to individuals he employed.

Plaintiff responds that Mendel controlled the way he worked by requiring approval for what he did and texting him instructions on what to do. Plaintiff claims that while he hired three part-time independent contractors to perform occasional work, it was for his own side printing businesses. He states that these side businesses were "wholly unrelated" to the work that he performed for Defendants.

"For purposes of analyzing the nature and degree of a purported . . . employer's control over an alleged employee, courts have held that '[c]ontrol arises . . . when the [employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign workers, or to take an overly active role in the oversight of the work.'" *Molina v. Hentech, LLC*, No. 6:13-cv-1111-Orl-22KRS, 2015 WL 1242790, at *3 (M.D. Fla.

Mar. 18, 2015) (quoting *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1178 (11th Cir. 2012)). "A purported employer takes an overly active role in the oversight of work 'when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained.'" *Id.* (quoting *Layton*, 686 F.3d at 1178). To demonstrate such control, the plaintiff must "reference[] specific instances where the control allegedly occurred." *Id.* (citing *Layton*, 686 F.3d at 1178).

There is no evidence that Mendel or the other Defendants imposed any control over Plaintiff's hiring decisions or the management structure of his businesses. Because he had no set schedule and did not punch a time clock, Defendants did not control when Plaintiff began his day or when he should start or stop his work. Plaintiff admits that Read performed some of the social media marketing functions for which he was being paid by Defendants. Doc. 50 at 28:25–29:19; 35:21–36:10; 45:5. Further, his contention that he was running Mendel's errands and doing very little social media work for Defendants is belied by his own testimony about the duties he performed for each establishment.[8] *See* Doc. 50 at 26:20–28:5; 32:24–33:12; 40:12–14.

---

[8] Plaintiff may not rely upon subsequent statements in a self-serving affidavit in an effort to defeat summary judgment by creating a dispute in facts where the affidavit contradicts his prior deposition testimony. *See, e.g., Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

The emails and texts from Mendel that Plaintiff relies on as evidence of control are more general in nature and do not demonstrate an overly active role in oversight of Plaintiff's work. To the contrary, the evidence reveals he had no set schedule or hours, he could come and go as he pleased, he worked from his own company's office rather than at the Defendants' businesses, except to attend meetings, he paid his own workers to perform some of the tasks for which he was being paid by Defendants, and Defendants did not object to his using his own workers. These factors weigh against a finding that Defendants controlled the manner in which Plaintiff performed his work.

### 2. Opportunity for Profit and Loss

On the second factor, Defendants argue that Plaintiff, as the owner of his own companies, had the opportunity for profit or loss, and thus was an independent contractor and not an employee.  Courts may find independent contractor status when a worker is able to obtain additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work. *See Scantland*, 721 F.3d at 1316–17. By utilizing his own workers to perform some of the services he was hired to perform, Plaintiff was able to be more efficient in accomplishing his work. With Read performing some of the social media marketing tasks for Defendants, this freed Plaintiff up to spend his time performing services for other clients. This factor weighs slightly in favor of independent contractor status.

### 3. Investment in Equipment or Materials

The "third factor considers the alleged employee's investment in equipment or materials required for his task, or his employment of workers." *Scantland*, 721 F.3d at

1317. Plaintiff testified that Read assisted in completing the social media tasks for Defendants' businesses. Additionally, Plaintiff worked out of his own office space. He used his own computers at his office. He testified that he would sometimes bring his laptop to Defendants' businesses. There is no indication that Defendants provided Plaintiff with a mobile phone or that they paid for his phone bill. He used his own vehicle (or had one of his employees drive him) when he went to Defendants' businesses. In response, Plaintiff claims his office space was for his printing company, which had nothing to do with his work for Defendants. He further claims that Buehler, Read and Guerrero provided their own equipment. Finally, he contends that Mendel made the monthly payments for Hootsuite, the social media marketing platform. Doc. 62 at 16. Considering the evidence in a light most favorable to Plaintiff, the Court still finds this factor weighs in favor of Plaintiff being an independent contractor. Although Mendel may have made the monthly payments for Hootsuite, Plaintiff testified he had the account before being employed by Defendants, the account was always in Plaintiff's name, and after he was terminated, he still had the Hootsuite account in his name but he removed the Defendants' business accounts from it. Doc. 50 at 57:3–59:1. And the fact that Read, Buehler, and Guerrero were using their own computers does not take away from the fact that Plaintiff was paying them, in part, to perform services for which Plaintiff was hired to do for Defendants and for which Plaintiff is now seeking overtime wages.

*4. Special Skill*

"The fourth factor considers whether the service rendered requires a special skill." *Scantland*, 721 F.3d at 1318. The relevant inquiry here is whether Plaintiff is dependent upon Defendants to equip him with the skills necessary to perform his job. *Id.* "A lack of specialization indicates that an individual is an employee, not an independent contractor." *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F.Supp.2d 1276, 1286 (M.D. Fla. 2006). Plaintiff contends he did not utilize any special skill for his work for Defendants. Doc. 62 at 16. In certain aspects, this is correct. Plaintiff's responsibilities of taking the girls out to events or bringing papers to a storage warehouse do not require any special skill. However, in seeking to be hired, Plaintiff offered to provide services for Defendants that included creating, implementing, and executing local content calendar for promotions; overseeing the implementation of marketing strategy; managing a social media presence and directing programs to improve social media reputation and recognition; continuously conducting analysis of competitive environment and consumer trends; developing and implementing brand strategy; and providing strategy, development, and consulting to assist in brand awareness. Doc. 90 ¶ 18. Thus, Plaintiff represented himself as bringing special skills to the position. Further, Defendants point to Plaintiff's LinkedIn page that represents Plaintiff's specialties as "in-depth experience across multiple marketing disciplines, full-stack web developer, SEO, digital marketing, strategy, printing, promotions, sponsorships/events, and direct marketing." Doc. 50-2. Plaintiff responds that Ed Valenti was responsible for Defendants' website. Even assuming that is the case, the

social media marketing services provided by Plaintiff directly or through Read would nevertheless be a special skill which would weigh in favor of independent contractor status. *See, e.g.,* Doc. 53-7 at 5 (email from Plaintiff stating he manages "57 social media marketing channels and websites for 6 [of Defendants'] brands").

### 5. Permanency and Duration

"The fifth factor considers the degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1318. The relevant inquiry here is the regularity and length of the working relationship between Plaintiff and Defendants. Plaintiff had a continuous relationship with Defendants that lasted nearly three years. This factor therefore militates in favor of finding employee status.

### 6. Integral Part of Alleged Employer's Business

Finally, the Court considers the extent to which Plaintiff's services were an integral part of the Defendants' operations. Defendants' businesses, except Duke's, are adult entertainment clubs. Duke's is a restaurant and sports bar that also provides music. Plaintiff's social media marketing and other duties were not integral to the operation of Defendants' businesses. Plaintiff's position clearly differs from those cases finding exotic dancers as being integral to the success of adult entertainment clubs. *See, e.g., Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1327 (S.D. Fla. 2017); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1349 (N.D. Ga. 2011). In those cases, it is the entertainment that is essential to the business. The logic would similarly apply to Duke's as the individuals serving the food and beer would be considered integral to the operation of the business. Plaintiff's role performing social media marketing

services or whatever tasks Mendel requested him to do would not be considered "integral" to the operation of Defendants' businesses. This factor weighs in favor of independent contractor status.

### 7. Consideration of all Factors

The totality of the circumstances requires a finding that Plaintiff acted as an independent contractor, and not an employee as defined by the FLSA, with regard to his work performed for Scores, Showgirls, and Duke's. Although the duration of his work relationship with Defendants was more akin to an employee than an independent contractor relationship and some of the duties he performed did not require special skills, the economic reality is that Defendants did not control Plaintiff's economic opportunity. Defendants were clients of Plaintiff. Plaintiff was free to perform media marketing and print services for other clients and did so. Plaintiff admittedly outsourced at least some of the social media marketing work he was to perform for Defendants to Read. Plaintiff was able to set his own schedule, he used his own office and computer, and he was able to come and go as he pleased.

Viewing the evidence in a light favorable to the Plaintiff, as the Court must do, the Court finds Plaintiff was not working as an employee of Scores, Showgirls or Duke's, and therefore he is an exempted independent contractor under the FLSA. Because an independent contractor is not an "employee" for purposes of the FLSA's overtime and minimum wage protections, *see Scantland*, 721 F.3d at 1311, the motion for summary judgment brought by Tampa Food and Hospitality, Inc., Plant City Hospitality, Inc., Duke's Brewhouse, Inc., and Louis Mendel (Doc. 49) is due to be

granted as it relates to Scores, Showgirls and Duke's. Mendel's motion for summary judgment as to the applicability of the executive and creative professional exemptions to Plaintiff's work as a manager at Truth is addressed below with Truth's Motion for Summary Judgment.

**B. Tampa Food & Entertainment's Motion for Summary Judgment (Doc. 48)**

Tampa Food & Entertainment similarly argues that, as to Truth Lounge, Plaintiff was an independent contractor. For the reasons stated above, the Court agrees, but only for social media marketing and other duties performed for Truth outside of the time frame he worked full-time as the interim manager. Defendant argues that even if Plaintiff could be considered an employee for work performed as a manager at Truth, the executive or creative professional exemptions apply to preclude any entitlement to overtime wages.

In a light favorable to Plaintiff, the Court finds his managerial work at Truth is consistent with the work of an employee. Beginning in February 2017, Plaintiff was responsible for "[h]iring, liquor, payroll, inventory, social media marketing, . . . banking every day, . . . go by the venue, pick up cash, count the cash in front of the manager, take the cash to the bank, get ones, cash petty cash checks, clean up around the place, . . . organize, clean." Doc. 50 at 45: 17–23. These are the type of day-to-day responsibilities that are integral to the operation of the club. He had a set shift schedule which demonstrates his lack of control. *See* Doc. 50 at 99 (testifying that the only time he had a set schedule was when he had to do something for Truth Lounge, when he had to open or close or do inventory). Any equipment necessary to perform

organizing, inventorying, or cleaning of the club would likely have been on site. In any event, there is no indication any special equipment was necessary to perform his day-to-day managerial responsibilities at the club or that the job required any special skills. For the period of time that Plaintiff was performing the position as interim general manager, he was working five shifts per week, eight to ten hours per shift. Doc. 50 at 48:9–13. Thus, Plaintiff would have been working as an employee for Truth 40 to 50 hours[9] per week for the time he was working as the interim general manager.[10] Having determined that Plaintiff was an employee for that period of time working as the interim general manager, the Court next turns to the applicability of the exemptions.

### 1. Exemptions

The Supreme Court has directed "that courts closely circumscribe the FLSA's exemptions." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) (quoting *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1977)). "Therefore, we narrowly construe exemptions to the FLSA overtime requirement." *Id.* (citing *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008)). "[T]he general rule [is] that the application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of

---

[9] Plaintiff testified, however, that he worked 25 to 40 hours weekly for Truth in 2017. Doc. 50 at 107:7–11.

[10] Following his work as interim general manager, Plaintiff did some shift work for a couple months as a day-manager, but he only worked three shifts per week, or 24 to 30 hours. Therefore, even if he is considered an employee while working as a day-manager, the overtime wage provisions of the FLSA would not apply as Plaintiff was working less than 40 hours per week.

proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). As a preliminary matter, Defendant Tampa Food & Entertainment has waived the applicability of the executive and creative professional exemptions because it did not timely raise them. Rule 8(c), Federal Rules of Civil Procedure, provides that "[i]n pleading a party shall set forth affirmatively ... waiver, and any other matter constituting an avoidance or affirmative defense." If the party fails to raise an affirmative defense in the pleadings, the party generally waives its right to raise the issue at trial. *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir. 1988). Thus, Tampa Food & Entertainment's motion for summary judgment as to the applicability of the exemptions will be denied because this Defendant did not raise these defenses in its Answer and Affirmative Defenses.

Defendant Mendel, however, did raise the exemptions as an affirmative defense in his amended answer. *See* Doc. 41. Mendel argues that he is entitled to summary judgment in his favor as it relates to Truth because even if Plaintiff was an employee of Truth, the executive and creative professional exemptions apply such that Plaintiff would be an exempt employee.

### 2. *Executive Exemption*

An employee is administratively exempt from the overtime provisions of the FLSA if he is employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). For the executive exemption to apply, an employee must (1) earn not less than $455 per week, (2) have the primary duty of management of the business, (3) customarily and regularly direct the work of two or more employees; and (4) have the authority to hire or fire other employees or whose

suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of employment are given particular weight. 29 C.F.R. § 541.100(a). FLSA exemptions are to be construed narrowly, and the employer bears the ultimate burden of proving that an exemption applies. *See Adams v. BSI Management Sys. Am., Inc.*, 523 Fed. App'x 658, 660 (11th Cir. 2013).

Mendel argues the executive exemption applies here because as general manager for Truth, Plaintiff was paid $1000 per week, he was responsible for managing the club, he supervised two or more employees, he had the authority to hire or fire employees, and he recommended the hire of St. John as his replacement. Doc. 49 at 23–24. In response, Plaintiff claims he was paid $200 per shift, not a salary. Plaintiff worked as an "interim" manager, he did not create schedules, he disputes that he supervised fellow employees, as opposed to contractors, as required for the executive exemption. Finally, Plaintiff claims he had no role in hiring St. John other than to suggest his name to Mendel who conducted the interview and hired him. Doc. 62 at 18–19.

Plaintiff attempts to create an issue of fact as to the amount of money he was paid as Truth's interim general manager, but he testified that most of the $1000 payments in 2017 were for working five shifts at Truth, during the time frame that he was serving as interim manager. *See* Doc. 50 at 46–47; 50-7 at 1. It appears for the relevant time period, there is no dispute that Plaintiff was earning in excess of $455 per week and the salary basis is satisfied.

The Court next must consider whether Plaintiff's primary duty was management. The Eleventh Circuit has rejected a "categorical approach" to deciding whether an employee is an exempt executive. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 at 1269, 1272 (citing *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (2008) (refusing to hold that store managers are exempt employees "as a matter of law" simply because the employee had responsibility over a free-standing business location)). Instead, the primary duty inquiry is "necessarily fact-intensive," consistent with the relevant Department of Labor regulation. *Rodriguez*, 518 F.3d at 1264; *Morgan*, 551 F.3d at 1269, 1272; 29 C.F.R. § 541.700(a) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."). The exemption should "be applied only to those [employees] clearly and unmistakably within the terms and spirit of the exemption." *Morgan*, 551 F.3d at 1269 (quoting *Brock v. Norman's Country Market*, 835 F.2d 823, 826 (11th Cir. 1988) (internal quotation omitted)).

The Department of Labor explains managerial responsibilities as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of

> materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The Regulations further identify a list of factors to consider in determining whether the employee's "primary duty" was management:

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

In applying the exemption, "[h]ow an employee spends [his] time working is a question of fact, while the question of whether the employee's particular activities exclude [him] from the overtime benefits of the FLSA is a question of law." *Langley v. Gymboree Operations, Inc.*, 530 F.Supp.2d 1297, 1301 (S.D. Fla. 2008) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

Courts analyzing the primary duty requirement will consider "the amount of time the managers spent performing managerial duties, the importance of those duties, the managers' independence and discretionary authority, and the difference between the managers' salaries and the wages paid to other employees." *Rodriguez*, 518 F.3d at 1264 (citing *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113–16 (9th Cir. 2001). On

this record, the Court finds that disputed questions of material fact exist as to how Plaintiff was spending his time while working as interim general manager, thereby precluding summary judgment. Plaintiff testified he did not make any employee schedules, but he did acknowledge supervising two people during a day managerial shift.  He denied hiring or firing anyone, but he acknowledged he introduced St. John to Mendel who was ultimately hired to be the new manager. He testified that his responsibilities as general interim manager included "[h]iring, liquor, payroll, inventory, social media marketing, . . . banking every day, . . . go by the venue, pick up cash, count the cash in front of the manager, take the cash to the bank, get ones, cash petty cash checks, clean up around the place, . . .  organize, clean." Doc. 50 at 45: 17–23. But neither side has offered any evidence as to how much time he spent on traditional managerial-type duties as elucidated by the Department of Labor, *see* 29 C.F.R. § 541.102, versus activities such as cleaning, stocking, customer service, or sales-related activities, *see Rodriguez*, 518 F.3d at 1265. Thus, the presence of disputed issues of material fact precludes a legal determination of whether the executive exemption applies to Plaintiff's work as the interim general manager at Truth. The summary judgment by Mendel as it relates to Truth and the applicability of the executive exemption to Plaintiff's work as the interim general manager for Truth is therefore due to be denied.

3. *Creative Professional Exemption*

With respect to the creative professional exemption, the Code of Federal Regulations provides that an "employee employed in a bona fide professional

capacity" is any employee "[c]ompensated on a salary or fee basis . . . not less than $684 per week" and "[w]hose primary duty is the performance of work … [r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a). The Code further states that "[t]he exemption does not apply to work which can be produced by a person with general manual or intellectual ability and training," and that "[t]o qualify for exemption as a creative professional, the work performed must be 'in a recognized field of artistic or creative endeavor'" such as "music, writing, acting and the graphic arts." *Id.* § 541.302(a), (b). Additionally, the Code recognizes that "[t]he duties of employees vary widely, and exemption as a creative professional depends on the extent of the invention, imagination, originality or talent exercised by the employee." *Id.* § 541.302(c). Because of this, "[d]etermination of exempt creative professional status ... must be made on a case-by-case basis." *Id.* As examples of what could or could not qualify, the Code explains:

> This requirement generally is met by actors, musicians, composers, conductors, and soloists; painters who at most are given the subject matter of their painting; cartoonists who are merely told the title or underlying concept of a cartoon and must rely on their own creative ability to express the concept; essayists, novelists, short-story writers and screen-play writers who choose their own subjects and hand in a finished piece of work to their employers (the majority of such persons are, of course, not employees but self-employed); and persons holding the more responsible writing positions in advertising agencies. This requirement generally is not met by a person who is employed as a copyist, as an "animator" of motion-picture cartoons, or as a retoucher of photographs, since such work is not properly described as creative in character.

*Id.*

Mendel argues that the creative professional exemption applies to Plaintiff because he hired Buehler to create graphic designs and promotional materials. Although Plaintiff testified he was not responsible for the creative content, Defendant argues Plaintiff should be treated as the one performing those duties because he outsourced this work to Buehler at his own expense. Plaintiff responds that it is only his activities, not those of individuals who worked for him, that are to be considered when determining the applicability of this exemption. Further Plaintiff argues that the creative work for Defendants was primarily completed by Ed Valenti and Brandy Phillips. Finally, Plaintiff contends that the social media work is not a recognized field of artistic or creative endeavor contemplated by the exemption.

Here, Mendel wholly fails to carry his burden to establish that the creative professional exemption applies in this situation. The record is devoid of evidence demonstrating that the type of social media marketing work performed involved "invention, imagination, originality or talent" exercised by the *employee*. Rather, Mendel merely argues that Buehler possessed the talent. Moreover, there is no evidence that the "primary duty" that Plaintiff was performing as interim general manager could be characterized as "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a). Even if the social media marketing work qualified as creative professional work, the evidence shows this was only one of many responsibilities he had while working as

interim manager for Truth. Mendel's motion for summary judgment as to the applicability of the creative professional exemption to Plaintiff's managerial work at Truth is due to be denied.

### C. Plaintiff's Motion for Partial Summary Judgment (Doc. 55)

Plaintiff seeks summary judgment in his favor on three issues. First, Plaintiff requests entry of partial summary judgment in his favor on his status as a non-exempt employee. For the reasons stated above, the Court finds that Plaintiff was an independent contractor as to Scores, Showgirls, and Duke's. As to Truth, Plaintiff was an independent contractor, except for the period of time he worked as the interim general manager being paid $1000 weekly for five shifts. During the time he worked as the interim manager, Plaintiff was an employee who worked 40 to 50 hours per week based on five shifts per week of eight to ten hours per shift. Doc. 50 at 47:17–48:13. Thus, Plaintiff was a full-time employee for approximately three months when he worked as the interim general manager for Truth and some of those weeks he worked in excess of 40 hours.

Second, Plaintiff seeks partial summary judgment as to the inapplicability of the executive and creative professional exemptions. With regard to his work at Scores, Showgirls, Duke's, and the work other than managerial work at Truth, the exemptions do not come into play because the Court finds Plaintiff was an independent contractor, and not an employee. Thus, the motion is denied in those instances. As to Truth, Plaintiff is entitled to partial summary judgment in his favor as to the inapplicability

of the exemptions due to Truth's failure to plead the exemptions as affirmative defenses.

For his time as the interim general manager for Truth, the Court finds that, in a light favorable to Defendant Mendel, questions of fact exist as to whether the executive exemption applies for the reasons discussed above.

With regard to the creative professional exemption, the Court finds Mendel fails to carry his burden that the exemption applies to the facts here. The record establishes that Plaintiff was not responsible for the creative content. Instead, it was primarily completed by others, i.e., Christina Autumn Buehler, Ed Valenti or Brandy Phillips. Likewise, there is no evidence before the Court to indicate that the social media marketing performed in this case involved invention, imagination, or originality, for example. The work performed is not in a recognized field of artistic or creative endeavor such as music and acting. Plaintiff is, therefore, entitled to partial summary judgment in his favor that the creative professional exemption does not apply.

Finally, Plaintiff argues he is entitled to partial summary judgment on the issue of liquidated damages. The decision to award liquidated damages is discretionary. 29 U.S.C. § 260. Under the FLSA a district court generally must award a plaintiff liquidated damages that are equal in amount to actual damages. The statute provides: "Any employer who violates the provisions of [the FLSA] ... shall be liable to the ... employees affected in the amount of their ... unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). An employer may avoid such liability, however, if it shows that "such action was in good faith" and

that there were "reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. To satisfy the subjective "good faith" component, the employer must affirmatively establish that "it had an honest intention to ascertain what the Act requires and to act in accordance with it." *Davila v. Menendez*, 717 F.3d 1179, 1186 (11th Cir. 2013) (quotation marks and citation omitted).

Plaintiff contends that he has established coverage and liability under the FLSA. In a light favorable to Defendants, he has not. The Court has already concluded above that Plaintiff was not an employee for Scores, Showgirls, Duke's, or Truth (other than when he worked as interim manager). With regard to his managerial work at Truth, the undisputed evidence shows he worked at least 40-hour workweeks as an employee for the period of time he served as the interim manager. While Plaintiff testified he worked 8 to 9 hour shifts for Truth, he also testified that in 2017 he worked 25 to 40 hours per week for Truth. *Compare* Doc. 50 at 48:11, *with* Doc. 50 at 107:10–11. Thus, it is not even clear that Plaintiff would be entitled to overtime wages.  Plaintiff's motion for partial summary judgment is due to be denied on the issue of liquidated damages.

## IV.   CONCLUSION

In sum, the Court finds that for the most part, Plaintiff's work for Defendants was as an independent contractor. He worked out of his own businesses' office, he had individuals working for him that did a portion of the work for which he is seeking to be paid by Defendants, he set his own schedule, did not punch a time clock, was operating two of his own businesses, had other clients, could come and go as he pleased, provided most of his own equipment, and performed services that required

36

special skills but which services were not an integral part of Defendants' businesses. For the period of time he worked as the interim manager for Truth, however, the Courts finds that Plaintiff was an employee who was working at a minimum of 40 hours per week for those approximate three months. Because disputed questions of material fact exist, issues remain for the finder of fact as to whether the executive exemption applies to Plaintiff's managerial work for Truth as it relates to Mendel's liability for overtime wages. Accordingly, for the reasons discussed above, it is hereby

     **ORDERED**:

     1.    Defendants Tampa Food and Hospitality, Inc.; Plant City Hospitality, Inc.; Duke's Brewhouse, Inc.; and Louis Mendel's Motion for Summary Judgment (Doc. 49) is **DENIED in part** to the extent that (a) Mendel may not rely on the creative professional exemption; and (b) the following claims remain for the jury's consideration: (i) whether the executive exemption applies to Plaintiff such that he is an exempt employee as to Mendel; (ii) if Plaintiff is non-exempt as to Mendel, the amount of overtime wages, if any, Plaintiff is entitled to for his full-time work employed as the interim general manager for Truth. In all other respects, Tampa Food and Hospitality, Inc.; Plant City Hospitality, Inc.; Duke's Brewhouse, Inc.; and Louis Mendel's Motion for Summary Judgment (Doc. 49) is **GRANTED**.

     2.    Defendant Tampa Food & Entertainment, Inc.'s Motion for Summary Judgment (Doc. 48) is **DENIED** as to the period of time Plaintiff worked as the interim general manager for Truth. At all other times, Plaintiff acted as an independent

contractor or was otherwise not working in excess of 40 hours per week for purposes of the FLSA, and the motion is **GRANTED**.

3.     Plaintiff Jason Lange's Motion for Partial Summary Judgment (Doc. 55) is **GRANTED in part** and **DENIED in part** as follows:

(a) On the issue of his status as an employee, the motion is **GRANTED** against Defendants Tampa Food & Entertainment and Mendel in that the Court finds that Plaintiff was an employee for FLSA purposes during the time period he worked full-time as the interim general manager for Truth. In all other respects on this issue, the motion (Doc. 55) is **DENIED**.

(b) On the issue of the inapplicability of the creative professional exemption as it pertains to his work as interim general manager at Truth, Plaintiff's motion is **GRANTED** as to Defendants' Tampa Food & Entertainment and Mendel.  In all other respects on this issue, the motion (Doc. 55) is **DENIED**.

(c) On the issue of the inapplicability of the executive exemption as it pertains to his work as interim general manager at Truth, Plaintiff's motion (Doc. 55) is **GRANTED** as to Defendant Tampa Food & Entertainment and **DENIED** as to Defendant Mendel. In all other respects on this issue, the motion (Doc. 55) is **DENIED**.

(d) On the issue of liquidated damages, the motion (Doc. 55) is

**DENIED**.

4.      Defendants Tampa Food and Hospitality, Inc; Plant City Hospitality, Inc.; and Duke's Brewhouse, Inc. are terminated as parties to this litigation.  A final judgment will be entered at the conclusion of this litigation.

5.      By separate notice, the Court will schedule a telephonic status conference to discuss scheduling the remaining issues for trial.

**DONE** and **ORDERED** in Tampa, Florida on February 22, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any